UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RAYMOND ROBINSON,

       Plaintiff,                    Civil Action No. 15-10607

          v.                     District Judge JOHN CORBETT O'MEARA
                                   Magistrate Judge R. STEVEN WHALEN

COMMISSIONER OF SOCIAL
SECURITY,

       Defendant.

_____/

## REPORT AND RECOMMENDATION

      Plaintiff Raymond Robinson ("Plaintiff") brings this action under 42 U.S.C. §405(g) challenging a final decision of Defendant Commissioner denying his application for Supplemental Security Income ("SSI") under the Social Security Act.  The parties have filed cross-motions for summary judgment.  Both motions have been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).   For the reasons discussed below, I recommend that Plaintiff's Motion for Summary Judgment be GRANTED to the extent that the case is remanded for further administrative proceedings, and that Defendant's Motion for Summary Judgment be DENIED.

## PROCEDURAL HISTORY

      On November 28, 2011, Plaintiff applied for SSI, alleging disability as of October

24, 2011 (Tr. 123).   Following the initial denial of benefits, Plaintiff requested an administrative hearing, held on August 16, 2013 in Fort Gratiot, Michigan (Tr. 28).  Jeanne M. VanderHeide, Administrative Law Judge ("ALJ") presided.  Plaintiff, represented by attorney Nicole Winston, testified (Tr. 34-48), as did Vocational Expert ("VE") Diane Regan (Tr. 48-52).  On September 11, 2013, ALJ VanderHeide found Plaintiff not disabled (Tr. 22-23).  On December 16, 2014, the Appeals Council denied review (Tr. 1-3).  Plaintiff filed suit in this Court on February 17, 2015.

## BACKGROUND FACTS

Plaintiff, born October 29, 1982, was 30 when ALJ VanderHeide  issued her decision (Tr. 23, 123).  He completed high school and worked previously as a kitchen helper and a retail worker (Tr. 168).  He alleges disability as a result of epilepsy (Tr. 167).

### A.  Plaintiff's Testimony

*Plaintiff's attorney prefaced her client's testimony by noting that Plaintiff alleged disability as a result of epilepsy, peripheral vestibular pathology, learning disorder, and memory loss* (Tr. 33).

Plaintiff offered the following testimony.

Plaintiff currently lived with his sister, her husband, and her four children (Tr. 34). He attended college courses as late as 2010 but did not obtain a degree due to lack of funds (Tr. 35).  He previously worked as a fast food worker but had never held a full-time job (Tr. 35).

Epilepsy was the primary reason he was unable to work (Tr. 36). He experienced his most recent seizure a few days before the hearing and before that, a few months earlier (Tr. 36). During his most recent seizure, he experienced an "aura" and began to twitch but did not lose consciousness (Tr. 36). He did not lose control of his bladder during the most recent seizure, but had done so in the past (Tr. 36). He reported going to the hospital every time he had a seizure (Tr. 37).

Plaintiff also experienced balance problems characterized by the inability to walk in a straight line without falling over (Tr. 37). He attributed the balance problems to a previous reaction to over-medication (Tr. 37). He did not experience problems sitting and did not use a cane (Tr. 38). Balance problems had not resulted in injuries (Tr. 38). The balance problems were resolved by sitting (Tr. 38). After a "really bad" seizure" he experienced body pain and the need to sleep for "days" (Tr. 38).

Plaintiff needed reminders to take his anti-seizure medication (Tr. 38). He experienced short-term memory problems (Tr. 39). At his request, his medication dosage directions were shared with his sister (Tr. 39). He saw a neurologist on an "as needed" basis (Tr. 39). In the past, he stopped taking anti-seizure medication because his treating source told him he was "seizure free," but he began experiencing seizures again in 2004 (Tr. 40).

Plaintiff was independent in self-care tasks but needed occasional reminders to shower and do his laundry (Tr. 41). He did not drive (Tr. 41). He was able to prepare simple meals and was able to grocery shop with his sister (Tr. 41). He was able to perform laundry chores,

-3-

clean the bathroom, and perform yard work (Tr. 42). He spent his time reading, going online, and interacting with his sister, niece, or nephews (Tr. 42). He did not participate in social clubs or organizations (Tr. 42). He lost his balance every day and required sitting breaks every 10 to 15 minutes (Tr. 43). He was unable to lift more than 15 pounds due to hand shaking (Tr. 43-44). His seizures were attributable to missing his medication doses (Tr. 44). He relied on his sister to remind him to take his medication (Tr. 44).

In response to questioning by his attorney, Plaintiff noted that before moving in with his sister 15 months earlier, he had not gone to the hospital every time he had a seizure (Tr. 45). He testified that leaving college was attributable to both lack of funds and his difficulty comprehending the course material (Tr. 46). Plaintiff stated that he had gone for as long as a week without showering when he "wasn't doing anything" (Tr. 46). He reported that based on his own research, he experienced petit mal, grand mal, and myoclonic seizures but acknowledged that he had been diagnosed with only the petit and grand mal type (Tr. 47). He alleged petit mal seizures "at least once a day," characterized by an "aura feeling" and slowed speech and reactions that resolved after 15 to 90 seconds (Tr. 47). Plaintiff received SSI payments for epilepsy when he was a child (Tr. 48).

### B.   Medical Evidence

### 1. Treating Sources

A January, 1995 school-related psychological evaluation showed good reading skills but weakness in Math (Tr. 345). Plaintiff exhibited "impaired spatial orientation" skills (Tr.

345).  February, 1999 academic records state that Plaintiff experienced a seizure disorder, attention deficit disorder, and a spatial disorder with "very poor short-term visual memory" (Tr. 240, 243). January, 2001 Individualized Educational Performance ("IEP") records state that Plaintiff had academic difficulty due to "spacial orientation and seizures" (Tr. 231). Plaintiff was deemed intellectually average, self-directed, and responsible (Tr. 231). He was placed in special education due to epilepsy (Tr. 232).

In November, 2007, Plaintiff was transported to the hospital after a seizure (Tr. 249). He reported that he had recently begun to experience seizures after 10 years of being seizure free (Tr. 249).  Plaintiff was advised not to use alcohol (Tr. 249).  His dosage of seizure medication was increased (Tr. 265).  A September, 2009 MRI of the brain showed "atypical" atrophic changes for Plaintiff's age (Tr. 280, 375).  April, 2010 emergency room records indicate that Plaintiff was treated for a seizure (Tr. 337).

In January, 2011, Demian Naguib, M.D., Ph.D. found that Plaintiff was disabled due to epilepsy, gait ataxia, peripheral neuropathy, mental impairment and cognitive delay (Tr. 277, 286).  April, 2011 Dr. Naguib stated that Plaintiff was disabled due to "intractable epilepsy," gait ataxia, peripheral neuropathy, mental impairment and cognitive delay" (Tr. 273).  Dr. Naguib noted that a recent MRI of the brain showed "developmental abnormalities" (Tr. 273).  He attributed Plaintiff's "mild partial complex seizure activity" to non-compliance with medication and the use of alcohol (Tr. 273).  Dr. Naguib cautioned Plaintiff not to use alcohol (Tr. 273).  Plaintiff reported that he was unable to afford

-5-

medication (Tr. 274).

August, 2011 treating records state that Plaintiff currently took Dilantin and Phenobarbital for seizures (Tr. 351, 368). In September, 2011, Plaintiff sought emergency treatment for a grand mal seizure (Tr. 323). He did not experience postictal symptoms (Tr. 317). The following month, Plaintiff again sought emergency treatment after experiencing a seizure (Tr. 294). Emergency room notes state that he had run out of medication three to four days earlier (Tr. 287, 294). Treating notes from the end of the same month state that Plaintiff had not yet refilled the seizure medication (Tr. 367).

On February 1, 2012, Plaintiff reported two seizure in the previous month (Tr. 367). A February, 2012 CT of the head showed sinus disease but no other abnormalities (Tr. 352, 381). Laboratory tests show that Plaintiff's level of Phenobarbital was in the sub-therapeutic range but Dilantin was in the therapeutic range (Tr. 386). In March, 2012, Plaintiff reported "12 small seizures" over the course of the last month despite taking medication as prescribed (Tr. 366). A January, 2013 MRA of the head was negative for aneurysm (Tr. 378). A January, 2013 MRI of the brain showed "scattered acute and chronic periventricular white matter ischemic changes" (Tr. 376, 454). January and February, 2013 testing again showed that Phenobarbital levels were in the sub-therapeutic range but in January, 2013, Dilantin levels were abnormally high (Tr. 382, 384). In January, 2013, Plaintiff reported that he did not adjust medication as advised, noting that he had "memory issues" (Tr. 365). Treating staff noted that due to memory problems, Plaintiff required "a second set of ears" when

-6-

receiving medical advice (Tr. 365). February, 2013 treating notes state that Plaintiff had not experienced seizures since December, 2012 and before that, July, 2012 (Tr. 364). Notes also state that Dr. Naguib refused to continue treatment due to Plaintiff's unpaid medical bill of $1,000 (Tr. 364).

April, 2013 treating notes state that Plaintiff denied recent seizures (Tr. 363). In June, 2013, Plaintiff was transported by EMS for emergency treatment for a seizure (Tr. 391). Drug testing showed that Dilantin and Phnobarital were present in sub-therapeutic levels (Tr. 393-294). He was discharged the same day in stable condition (Tr. 397). The following month, neurologist Marwan Shuayto, M.D. performed a consultative examination, noting that recent testing showed Dilantin present at therapeutic levels (Tr. 439). Plaintiff also complained of equilibrium problems that were becoming "progressively . . . worse" (Tr. 439). Plaintiff admitted to occasional marijuana use (Tr. 439). He reported memory loss and nervousness (Tr. 446). Dr. Shuayto noted semi-yearly breakthrough seizures (Tr. 440). He cautioned Plaintiff to discontinue marijuana use due to the potential interaction with prescribed medication (Tr. 440). Later the same month, a Vestibular Autorotation Test ("VAT") showed a peripheral vestibular pathology[1] (Tr. 459). Emergency room records from the following month show that Plaintiff experienced another seizure (Tr. 463).

---

[1]

Peripheral vestibular pathology ("PVP") "diminishes available sensory information regarding head position and movement." Http://www.neuropt.org/docs/vsig-physician -fact-sheets/peripheral-vs-central- vestibular-disorders  (last visited February 2, 2016). Disorders associated with PVP include neuritis, labyrinthitis, bilateral vestibular loss, Meuniere's Disease, and Benign Paroxysmal Positional Vertigo ("BPPV"). *Id.*

## 2.  Non-Treating Sources

In February, 2012, Wayne Hill, Ph.D. completed a non-examining review of Plaintiff's treating and consultative records, finding that he experienced mild limitation in activities of daily living, social functioning, and concentration, persistence, or pace (Tr. 58-59).  Dr. Hill found Plaintiff's allegations of disability "marginally credible," noting that Plaintiff continued to use alcohol after being advised that alcohol contributed to the seizures (Tr. 59).

### C.  Vocational Expert Testimony

VE Diane Regan began her testimony by noting that Plaintiff's past earnings did not amount to substantial gainful activity (Tr. 50).   ALJ VanderHeide then posed the following question to the VE, describing a hypothetical individual of Plaintiff's age, education, work experience, and skill set with the following limitations:

> [A]ssume . . . . the individual was limited to light work[2] as defined by the regulations, however the claimant would be limited to lifting up to 15 pounds, the individual would require a sit/stand option to sit or stand alternatively at will provided the employee is not off task more than 10 percent of the

---

[2]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. *Very Heavy* work requires "lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. § 404.1567(e).

-8-

workday. The individual should avoid climbing ladders, ropes, or scaffolds, should avoid all direct use of moving machinery and all exposure to unprotected heights. Work would be limited to simple, routine and repetitive tasks and that the individual would also require written versus visual instruction. The individual . . . should be employed in a low-stress job defined as having only occasional decision making and no fast-pace production requirements. Given those limitations, the individual has – the claimant has no past work. Any other jobs that would exist in the national and local economy? (Tr. 50).

The VE testified that the above limitations would allow for the exertionally light, unskilled work of a packer (3,000 jobs in southeast Michigan); sorter (2,000); and small products assembler (4,000) (Tr. 51). The VE testified further that if the above limitations were amended to limit the individual to *sedentary* work, the individual could work as an assembler (3,000); sorter (2,000); and inspector (2,000) (Tr. 51). The VE stated that employers generally tolerated a half-hour break for lunch and two additional 15-minute breaks each day and up to "one to two" absences each month (Tr. 51). She testified that additional breaks or absences would preclude competitive work (Tr. 51). The VE concluded her testimony by stating that the need to be off-task for more than 20 percent of the workday would also be work preclusive (Tr. 52).

### D. The ALJ's Decision

Citing Plaintiff's medical records, ALJ VanderHeide found the severe impairments of "epilepsy; peripheral vestibular pathology; and visual learning disorder and resulting memory impairment with orientation, copying and subcortical functioning" but that none of the conditions met or medically equaled any impairment listed in 20 C.F.R. Part 404, Subpart

P, Appendix 1 (Tr. 15). She found that due to the organic brain conditions or learning disorders, Plaintiff experienced mild limitation in activities of daily living and social functioning and moderate limitation in concentration, persistence, or pace (Tr. 17). She found that Plaintiff retained the  residual functional capacity ("RFC") for sedentary work with the following additional limitations:

> The claimant requires the option to alternate between sitting and standing at will provided that []he is not off task more than 10 percent of the work period. The claimant cannot climb ladders, ropes or scaffolds. The claimant should avoid all exposure to direct use of moving machinery and to unprotected heights. The claimant is limited to simple, routine and repetitive tasks, with written (as opposed to visual) instruction. The claimant requires a low stress job, defined as involving only occasional decision making and no fast paced production requirements (Tr. 18).

Citing the VE's testimony, the ALJ found that Plaintiff could work as a sedentary assembler, sorter, or inspector (Tr. 22).

The ALJ discounted the January, 2011 opinion that Plaintiff was disabled due to epilepsy, an abnormal gait, peripheral neuropathy, and memory problems on the basis that it contradicted "contemporaneous clinical" findings and "other objective observations" (Tr. 19). She noted further that at the time of the January, 2011 opinion, Plaintiff was "apparently non-compliant with medical advice" (Tr. 19). The ALJ concluded that Plaintiff's seizures were "quite well controlled with medication" (Tr. 21). He noted that Plaintiff's conditions did not prevent him from performing laundry chores, interacting with his family, attending college, and maintaining social contacts (Tr. 21).

-10-

**STANDARD OF REVIEW**

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence.  42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence is more than a scintilla but less that a preponderance.  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,*  800 F.2d 535, 545 (6th Cir. 1986)(en banc).  In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ.  *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

**FRAMEWORK FOR DISABILITY DETERMINATIONS**

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected

-11-

to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five  to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984)

## ANALYSIS

### A.  The ALJ's Step Three Findings

In his first argument, Plaintiff disputes the Step Three finding that the condition of epilepsy neither met nor equaled a listed impairment.  *Plaintiff's Brief,* 6-11, *Docket #17.* He contends that his allegations of daily petit mal seizures support a finding that he equaled Listing 11.02 or 11.03.  *Id.*;  20 C.F.R. Part 404, Subpart P, Appendix 1 § § 11.02, 11.03. Plaintiff also notes that the ALJ's finding that his physical conditions did not medically equal any of the listed impairment was unsupported by a medical opinion.  Plaintiff contends that the absence of a medical expert finding that his conditions did not equal a listed impairment invalidates the ALJ Step Three determination.

1.   **Substantial Evidence Supports Finding that Plaintiff Did Not Meet Listing 11.02 or 11.03.**

At Step Three of the administrative sequence, a claimant meeting or medically equaling "the requirements of a Listed Impairment will be deemed conclusively disabled, and entitled to benefits." *Reynolds v. Commissioner of Social Security*, 424 Fed.Appx. 411, 414, 2011 WL 1228165, *2 (6th Cir. April 1, 2011); 20 C.F.R. §§ 404.1520(a)(4) (iii), 416.920(a)(4)(iii). "Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the SSA considers to be 'severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.' " *Id.* (citing 20 C.F.R. § 404.1525(a)).

To meet Listing 11.02, a claimant must show the following:

11.02 *Epilepsy—convulsive epilepsy*, (grand mal or psychomotor), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month in spite of at least 3 months of prescribed treatment.

A. Daytime episodes (loss of consciousness and convulsive seizures) or

B. Nocturnal episodes manifesting residuals which interfere significantly with activity during the day.

As noted by the ALJ, the treating records show that Plaintiff's grand mal seizures occurred less than once a month (Tr. 16, 19-20, 45-47, 363-364, 393-394).  Further, even assuming that Plaintiff could establish the above criteria, he would be unable to meet the threshold requirement, as stated in Listing 11.00A, that Listing 11.02 "criteria can be applied

-13-

only if the impairment persists despite the fact that the individual *is following prescribed antiepileptic treatment*." Part 404, Subpart P, Appendix 1 § 11.00A (emphasis added). The same listing also states that the claimant's "use of alcohol or drugs" affecting "adherence to prescribed therapy" and the precipitation of seizures should be considered in determining whether the claimant is compliant with treatment. The ALJ correctly noted that Plaintiff, by his own acknowledgment and the laboratory studies, was not compliant with the medication regime (Tr. 19-20, 272, 309, 348-349). The record also shows that his failure to take the medication as prescribed was further undermined by his continued use of alcohol and marijuana (Tr. 273, 440, 446). Because Plaintiff cannot meet even the threshold requirement of medication compliance, his argument that he meets Listing 11.02 is without merit.

Likewise, the ALJ did not err in finding that Plaintiff did not meet Listing 11.03 *Epilepsy—nonconvulsive (petit mal, psychomotor, or focal)*:

> [E]pilepsy, documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment. With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

Again, Plaintiff cannot meet the threshold requirement that he was medication compliant. § 11.00A. Even assuming that he took the epilepsy medication as directed and refrained from alcohol or marijuana use, substantial evidence supports the determination that he did not meet Listing 11.03. Plaintiff argues that his testimony of daily seizures supports

-14-

a finding that he meets the Listing. However, his allegations of daily seizures are contradicted by treatment notes stating that he did not experience seizure activity between July and December, 2012 (Tr. 364) and his April, 2012 denial of recent seizure activity (Tr. 439). Even if the ALJ had credited Plaintiff's testimony of daily petit mal seizures, Plaintiff did not allege that they were accompanied by "unconventional behavior or significant interference" with daily activities (Tr. 47).

Accordingly, the ALJ did not err in determining that Plaintiff did not meet either Listing 11.02 or 11.03.

### 2. The Evidence Supports the Need for an Equivalency Determination by a Physician

Plaintiff also argues that at Step Three, the ALJ's finding that Plaintiff's conditions did not medically *equal* a listed impairment was unsupported by the opinion of a medical expert. *Plaintiff's Brief* at 7-11. In response, Defendant acknowledges that the ALJ erred by failing to procure an equivalency opinion, but argues that the omission was harmless error. *Defendant's Brief,* 15-19, *Docket #18.*

Plaintiff is correct that at Step Three, "longstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge ... must be received into the record as expert opinion evidence and given appropriate weight." SSR 96–6p, 1996 WL 374180, *3 (July 2, 1996); *See also Pizzo v. Commissioner of Social Sec.*, 2014 WL 1030845, *19 (E.D.Mich. March 14, 2014) (*relying on Stratton v. Astrue*, 987 F.Supp.2d 135, 147-148

(D.N.H. 2012))("[T]he lack of any medical opinion on the issue of equivalence is . . . an error requiring remand").

Defendant argues that in the present case, the lack of an equivalence opinion by a physician is harmless error. *Defendant's Brief* at 15-16 (*citing Bukowski v. CSS*, 2014 WL 4823861, *6 (E.D. Mich. Sept. 26, 2014); *Rabbers v. CSS,* 582 F.3d 647, 655-658 (6th Cir. 2009).  Defendant contends that "Plaintiff has not pointed to any evidence that would plausibly support an equivalence finding." *Id.* at 17.

The facts of this case nonetheless point toward a finding of reversible error.  While in some cases, a finding of harmless error is appropriate, " courts generally should exercise caution" in finding that the omission of a key portion of the administrative analysis is harmless. *Rabbers, supra,* 582 F.3d at 657-58.  The transcript shows that Plaintiff experienced significant and long-term limitations as a result of epilepsy and cognitive problems.  To be sure, the ALJ performed an adequate Step Three analysis of epilepsy and the mental disorders under Listings 11.02, 11.03, 12.02, and 12.05.  However, the ALJ's Step Three findings contained no mention of whether peripheral vestibular pathology ("PVP"), identified at Step Two as a severe impairment, met or medically equaled a listed impairment. The ALJ's failure to acknowledge PVP at Step Three is particularly critical, given that the well-supported balance problems resulting from the condition were accompanied by a spatial disorder and epilepsy.  While in *Bukowski, supra,* the failure to procure a medical equivalence opinion for a physical ailment was harmless error where the psychiatric

-16-

impairments were the basis for the disability claim, *id.* at *6, here, the balance problems and dizziness resulting from PVP, a second severe physical impairment, potentially exacerbates limitations created by the organic mental/cognitive disorders and epilepsy.

Other factors support the need for a equivalence finding by a physician. The ALJ stated that her finding that Plaintiff did not "medically equal" a listed impairment was supported by "the medical opinion of the State agency and/or consultative physician(s), all of whom considered the relevant listings" (Tr. 15). To the contrary, the physical findings were supported by a Single Decision Maker ("SDM") rather than a physician and thus, did not constitute medical evidence (Tr. 15, 64). *See Stratton*, *supra*, 987 F.Supp.2d at 147-148 (reliance on the opinion of an SDM rather than a medical expert intrinsically improper); *see also Lindsey v. Commissioner of Social Sec.,* 2013 WL 6095545, *6 (E.D.Mich. November 20, 2013)(same).

The ALJ's Step Three findings are additionally problematic. Although psychologist Dr. Hill's equivalency determination satisfied the equivalency requirement for the mental limitations, the ALJ gave his opinion "limited weight" because it contradicted the later treating records and Plaintiff's testimony (Tr. 20). Moreover, Dr. Hill's February, 2012 non-examining findings are undermined by the newer treating evidence showing a greater degree of physical limitation (July, 2013 diagnosis of PVP) and mental limitation (January, 2013 memory problems) (Tr. 365, 469). *See Blakley v. Commissioner Of Social Sec.,* 581 F.3d 399, 409 (6th Cir. 2009)(reliance on non-examining source where later treating records show

greater limitation constitutes grounds for remand).

While Defendant is correct that in some instances, the lack of a medical opinion amounts to harmless error, such is not the case here. The ALJ's failure to procure an equivalency opinion regarding the physical limitations, coupled with the articulation and substantive mistakes at Step Three, mandates remand. *Reynolds,* 424 Fed.Appx. at 416.

### B. The Treating Physician Analysis

Plaintiff also faults the ALJ for giving limited weight to Dr. Naguib's January, 2011 disability opinion. *Plaintiff's Brief* at 11-15. Plaintiff points out that the only other opinion regarding his physical limitations was made by a SDM whose opinion, as discussed above, does not constitute medical evidence. *Id.* at 14.

It is long established that "if the opinion of the claimant's treating physician is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, it must be given controlling weight." *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir.2009) (internal quotation marks omitted)(citing *Wilson v. CSS*, 378 F.3d 541, 544 (6th Cir.2004); 20 C.F.R. § 404.1527(c) (2)). However, in the presence of contradicting substantial evidence, the ALJ may reject all or a portion of the treating source's findings, *see Warner v. Commissioner of Social Sec.*, 375 F.3d 387, 391-392 (6th Cir.2004), provided that he supplies "good reasons" for doing so. *Wilson*, at 547; 20 C.F.R. § 404.1527(c)(2)). In explaining the reasons for giving less than controlling weight to the treating physician opinion, the ALJ must consider

(1) "the length of the ... relationship" (2) "frequency of examination," (3) "nature and extent of the treatment," (4) the "supportability of the opinion," (5) "consistency ... with the record as a whole," and, (6) "the specialization of the treating source." *Wilson*, at 544.

The failure to articulate "good reasons" for rejecting a treating physician's opinion constitutes reversible error. *Gayheart v. CSS*, 710 F.3d 365, 376 (6th Cir.2013); *Wilson,* 378 F.3d at 544–546 (6th Cir.2004)(citing § 404.1527(c)(2)). "[T]he Commissioner imposes on its decision-makers a clear duty to 'always give good reasons in our notice of determination or decision for the weight we give [a] treating source's opinion.'" *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir.2011). "These reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Gayheart*, at 376 (citing SSR 96–2p, 1996 WL 374188, *5 (1996)).

Plaintiff's argument that the ALJ did not abide by the requirements of a treating physician analysis is partially correct.  The ALJ acknowledged that Dr. Naguib was a treating source and a neurologist[3] (Tr. 19).   She noted that Dr. Naguib's observation of a normal gait stood at odds with his disability opinion stating that Plaintiff had gait ataxia (Tr. 19).  The ALJ also noted that Dr. Naguib's opinion that "intractable epilepsy," and cognitive disorders was made at a time when Plaintiff was not compliant with the prescribed medication or

---

[3]While the ALJ did not state that Dr. Naguib was a treating source, she discussed his treating records as well as the January, 2011 disability opinion.

-19-

advice to stop drinking (Tr. 19).  The ALJ complied with the procedural requirements of the treating physician analysis.

However,  records created subsequent to Dr. Naguib's January, 2011 opinion showing memory problems and a diagnosis of PVP tend to support rather than undermine the treating opinion.  For example, Dr. Naguib's finding that Plaintiff had gait ataxia on some occasions, but at another time, exhibited a normal gait, could be attributable to the previously undiagnosed condition of PVP, a condition which would explain an intermittently unsteady gait.   Plaintiff's memory problems, well documented by the more recent treating notes (showing that he regularly neglected to take his medicine unless reminded by his sister) also support the conclusion that the cognitive disorders, coupled with the other conditions, were disabling.  Because the more recent records largely support Dr. Naguib's finding of gait problems and cognitive limitations, the ALJ should be required, at a minimum, to re-evaluate Dr. Naguib's opinion based both Dr. Naguib's own notes *and* the subsequent records.

 For these reasons, a remand is required.  However, because it cannot be said that "all essential factual issues have been resolved," a remand for further fact-finding, rather than an award of benefits, is appropriate. *Faucher v. Secretary of Health and Human Services*, 17 F.3d 171, 176 (6th Cir.1994).  Upon remand, I recommend that the ALJ  (1) procure an equivalency opinion regarding the physical conditions by a medical expert and,(2) address the more recent evidence in re-evaluating Dr. Naguib's January, 2011 opinion.

## <u>CONCLUSION</u>

For these reasons, I recommend that Plaintiff's Motion for Summary Judgment be GRANTED to the extent that the case is remanded for further administrative proceedings, and that Defendant's Motion for Summary Judgment be DENIED.

Any objections to this Report and Recommendation must be filed  within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir.  1991); *United States v. Walters,* 638 F.2d 947 (6th Cir.  1981).  Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir.  1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir.  1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Date: February 4, 2016

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was sent to parties of record on February 4, 2016, electronically and/or by U.S. mail.

s/C. Ciesla
Case Manager